UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) and ITS LOCAL UNION 662, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | CASE NO. 1:03-cv-0543-DFH-WTL |
| v. | ) ) | |
| DELCO REMY AMERICA, INC. and DELCO REMY INTERNATIONAL, INC., | ) ) ) | |
| Defendants. | ) | |

ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case presents disputes regarding a collective bargaining agreement between plaintiffs International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, and its Local Union 662 (the Union) and defendants Delco Remy America, Inc. and Delco Remy International, Inc. (collectively, the Company) under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In 2003, the Company shut down its manufacturing plant in Anderson, Indiana, causing the loss of employment for approximately 350 employees. The Union claims that the Company breached the parties' collective bargaining agreement by refusing to provide the employees with (1) health and vision insurance benefits in accord with the agreement's Health Care Program, and (2) unemployment benefits under the agreement's Supplemental

Unemployment Benefit Plan ("SUB Plan").  The Company claims that the terms of the agreement did not require either type of benefit in light of the way the Company handled the closure of the Anderson plant.

The Company has moved for summary judgment on the Union's claims. The Union has moved for partial summary judgment on the issue of liability.  For reasons stated below, both motions are denied.

### Summary Judgment Standard

Summary judgment should be granted when the pleadings, depositions, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the court considers the undisputed facts and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  The fact that the parties have filed cross-motions for summary judgment does not alter the applicable standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact.  *E.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  A factual issue is material if resolving

the issue may influence the outcome of the suit under governing law.  *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).

Courts presented with motions for summary judgment based on contract interpretation "must determine (1) if the contract is ambiguous or unambiguous and (2) if it is ambiguous, whether after consideration of the extrinsic evidence, there are any issues of triable fact."  *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993).  Summary judgment may be appropriate where the relevant contractual provisions are unambiguous, having only one reasonable interpretation, as applied to the relevant factual circumstances.  See *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir. 1989); *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994).

*Discussion*

I.      *The Health Care Program*

The first issue is whether the Company breached an obligation to provide the employees with health insurance (which the parties refer to as core and vision coverage) under the collective bargaining agreement's "UAW - Delco Remy America Health Care Program" (Health Care Program) and the Supplemental Agreement amending it in 1997.   Jt. Ex. 4.   Both the Health Care Program and the Supplemental Agreement are included in a three-year collective bargaining

agreement that was formed by the parties in 1997 and extended in 2000 "through 11:59 pm on March 31, 2003."  English Aff. ¶ 4; Jt. Ex. 9.  The Supplemental Agreement states that its provisions supersede provisions of the Health Care Program in the event of a conflict between the two, Jt. Ex. 4 at 7, and that the "[Health Care] Program as modified and supplemented by [the Supplemental Agreement] shall continue in effect until the termination of the Collective Bargaining Agreement of which [it] is a part."  *Id.* at 12.

Article III, Sections 3(c) and (d) of the Health Care Program state:

> (c) Core and vision coverages shall be continued during periods of layoff for up to 25 consecutive months . . . following the last month of coverage for which the Corporation contributed for the employee in accordance with subsection (a) above, provided the employee's seniority is not broken.
>
> * * *
>
> (d) The Corporation has established a schedule on the basis of Seniority, or on some other basis, under which the Corporation will contribute, during a specified number of full calendar months of layoff, for core and vision coverages continued in accordance with subsection (c) above.

*Id.* at 30-31.  The Supplemental Agreement includes the schedule referred to in paragraph (d).  The length of continued coverage is based on employee seniority, with employees of ten or more years receiving 25 months of continued coverage. *Id.* at 8.  Article IV of the Health Care Program defines "layoff" as "any layoff as a result of a reduction in force, temporary layoff, or from the discontinuance of a plant or operation. . . ."  *Id.* at 47.  Article III states that employees who quit or are discharged from employment will be provided coverage only until "the last day of

the month in which the employee quits or is discharged or, if later, the date seniority is broken." *Id.* at 34-35.

After notifying the Union of its plans to shut down the Anderson facility, the Company issued its "Last, Best, and Final Offer" to the Union on March 24, 2003. Jt. Ex. 16; Jt. Ex. 18c.  The final offer stated that the "only pre-existing agreements that would not be terminated 3/31/03 are the Pension Plan and the Health Care Program (for terminated employees through the end of their COBRA period. . . .)." Jt. Ex. 18c at 1-2.  After the Anderson facility was shut down, the Company provided health care coverage for the employees for three months in accordance with the final offer.  Messer Dep. at 100.  On December 19, 2003, the Company issued a document stating that the Health Care Program was "amended, effective as of March 31, 2003," in accordance with the terms of the final offer.  Jt. Ex. 32.

The Company claims that the Anderson facility was shut down, the employees "terminated," and the final offer implemented on April 1, 2003, after the collective bargaining agreement had expired.  Def. Br. at 6, 13; Def. Reply Br. at 25.  Under the Company's theory, the 25 months of extended core health and vision coverage is not available because the obligation to provide it expired with the collective bargaining agreement, and because the employees were terminated after the agreement expired.  The Union claims that the 25 month obligation could outlive the agreement, that the facility was shut down no later than March 29,

2003, and that the employees were laid off instead of terminated.  Pl. Br. at 13. Each side has presented evidence supporting its position.

The court must first decide whether the terms of the agreement unambiguously created or prohibited employee rights to core health and vision coverage that survived termination of the collective bargaining agreement.  Though employee rights to welfare benefits are normally presumed to terminate with the agreement that established them, employee rights that vest or accrue under a collective bargaining agreement "will, as a general rule, survive the termination of the agreement." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607 (7th Cir. 1993) (*en banc*) (Posner, J.), citing *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 207 (1991).[1]  The issue in *Bidlack* was whether provisions of a collective bargaining agreement provided lifetime benefits to retirees beyond the term of the agreement.  The district court had granted summary judgment for the employer, but the Court of Appeals reversed.  The lead opinion found the provision at issue in *Bidlack* vague enough to warrant trial.  "[T]he provision [did] not say 'when they die or the collective bargaining agreement expires, whichever occurs first,' but simply when they die."  993 F.2d at 608.  The court went on to explain that the extrinsic evidence raised genuine issues of material fact over whether the contract actually provided lifetime benefits.  *Id.* at 609-10.

---

[1]The opinion of Judge Posner, joined by two other judges, appears to provide the narrowest ground for the *en banc* court's reversal of the district court judgment in *Bidlack*.  Judge Cudahy, also joined by two other judges, concurred in the judgment but on grounds of broader application.

The Company relies on *Pabst Brewing Co. v. Corrao*, 161 F.3d 434 (7th Cir. 1998), and *Senn v. United Dominion Industries, Inc.*, 951 F.2d 806 (7th Cir. 1992). *Corrao* addressed whether the employer's cancellation of all retiree health benefits violated the collective bargaining agreement between the parties.  161 F.3d at 436. The provisions at issue included one which stated that "retirees on Total and Permanent disability retirement currently not covered by Major Medical will be covered until they reach age 65" and another stating "that 'employees in retired status and their dependent spouse [sic] who are enrolled in government Medicare Plans. . . .shall be provided Blue Cross and Blue Shield Medicare Extended coverage.'"  *Id.*  Using *Bidlack* as its guide, the Seventh Circuit affirmed a district court's grant of summary judgment in favor of the employer where the contract contained the following provision:

> For the term of this Agreement, the Employer, at its sole cost and expense, shall provide major medical, health, dental, sickness and accident, and life insurance benefits in accordance with an[d] as summarized in Appendix A attached.

161 F.3d at 435-36.  The court found that the provision unambiguously limited retiree benefits to the term of the agreement, especially where the employer demonstrated that it had regularly modified such benefits without complaint from the retiree recipients.  *Id.* at 436, 442.

Though *Corrao* offers an example of contractual language that limits retiree benefits, it does not control the relevant provisions at issue here.  Unlike the

employees in *Corrao*, who sought long-term, and in some cases lifetime, coverage for retirees, the Union here seeks health coverage for only the specific and limited duration enumerated in the contract, a period not exceeding 25 months. Also, the relevant provisions granting coverage in *Corrao* were far less specific as to duration of benefits, and the limiting language was more specific, than the provisions now at issue.

*Senn* is equally distinguishable from the present case. In *Senn,* the plaintiff retirees sought lifetime benefits based on a provision in the applicable collective bargaining agreement stating only that such benefits would "continue," despite an additional provision in the agreement stating that medical coverage would be provided "during the term of [the] Agreement." *Senn*, 951 F.2d at 815-16. The court interpreted the provisions to bar extension of retiree health benefits beyond the term of the agreement because the relevant provisions were "either silent on the question of whether a right to lifetime benefits should vest or appear[ed] to explicitly prohibit such vesting." *Id.* *Senn* does not control here because the provisions establishing employee health benefits specifically provide the duration of coverage and the benefits at issue are of a limited term, not the lifetime benefits sought in *Senn*. See also *Bidlack*, 993 F.2d at 605 (limiting *Senn*)

The Health Care Program and Supplemental Agreement in the present case do not resolve the core health and vision coverage issue by explicitly stating that the employee's rights "vest" beyond the term of the agreement. *Bidlack*

-8-

established, though, that such vesting language is not required if the agreement otherwise makes clear that the rights do not end when the agreement expires. 993 F.2d at 607 (rejecting the "extreme" position "that the contract must either use the word 'vest' or must state unequivocally that it is creating rights that will not expire when the contract expires"); accord, *Pabst Brewing v. Corrao*, 161 F.3d at 440. In this case, the purpose of the agreement and the logic of the relevant provisions demonstrate that accrued employee rights to core health and vision coverage, in accordance with Article III Section 3(c) and the schedule provided in the Supplemental Agreement, survived the termination of the collective bargaining agreement.

The 1997 collective bargaining agreement was limited to a three-year term. English Aff. ¶ 4. Article III Section 3(c) of the Health Care Program provided that coverage "shall be continued during period of layoff for up to 25 consecutive months. . . .provided the employee's seniority is not broken." Jt. Ex. 4 at 30. Termination of rights to coverage with the agreement's end, as proposed by the Company, would render the 25-month provision fully effective for only the first eleven months of the contract term. The provision does not say that the coverage "shall be continued during a period of layoff for up to 25 consecutive months, or the termination of the collective bargaining agreement, whichever occurs first," which could have been easily added if that were what the parties had intended. See *Bidlack*, 993 F.2d at 609. The specific duration of benefits provided by Article III Section 3(c) of the Health Care Program and enumerated by the schedule in the

Supplemental Agreement strongly implies that the parties intended for such coverage to be provided as written.

Article III Section 3(c) and the accompanying schedule do not offer illusory, silent, or lifetime promises. They state that those who are laid off will receive core health and vision coverage for the enumerated time periods. The agreement is not ambiguous on this score. These specific and bargained-for employee rights survive the termination of the agreement for the mutually agreed-upon period, at least if the contractual conditions for entitlement are otherwise satisfied.

The Company argues that even if the collective bargaining agreement granted the employees rights in core health and vision coverage beyond the term of the agreement, an impasse in negotiations between the Company and the Union allowed the Company to alter such rights unilaterally by implementing its final offer. Def. Reply Br. at 7. The Company cites case law stating that where the parties to collective bargaining negotiations reach an impasse, "the employer is free to operate his business as he did before the bargaining began, and therefore he may alter the terms and conditions of the workers employment." *Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995, 996 (7th Cir. 2000); *Hill-Rom Co. v. NLRB*, 957 F.2d 454, 457 (7th Cir. 1992). The argument adds nothing new to the issue, though. Neither case cited by the Company dealt with employee rights to benefits already accrued or vested under an agreement, such as those granted by the agreement now before the court. Additionally, the court in *Hill-Rom* upheld the

employer practice at issue in that case, a transfer of employee positions out of the bargaining unit of which they were a part, because "no provision of the collective bargaining agreement precluded" the transfer. *Hill-Rom*, 957 F.2d at 458. The present circumstances are easily distinguished. Employees who are laid off during the life of the agreement are specifically granted vested rights to coverage in accordance with the terms of the agreement.

The contract provisions unambiguously show that the parties agreed that laid off employees would receive accrued core health and vision benefits that could extend beyond the expiration of the agreement. However, genuine issues of material fact remain in this case regarding whether the employees at issue were in fact laid off during the term of the agreement or whether they were instead terminated after the expiration of the agreement. The parties have offered conflicting evidence, some indicating that the employees were laid off before April 1, 2003, and other evidence indicating that they were terminated on or after April 1, 2003. This issue cannot be resolved as a matter of law. Neither side is entitled to summary judgment on the claimed entitlement to the continued core health and vision benefits.

II.     *The SUB Plan*

The SUB Plan provides that upon the termination of the collective bargaining agreement, the Company had the right to continue, "modify, amend, suspend, or terminate the Plan." Jt. Ex. 3 at 276. The SUB Plan also states:

> Upon any termination of the Plan, the Plan shall terminate in all respects except that the assets then remaining in the Fund shall be used to pay expenses of administration and to pay Benefits to eligible Employees for a period of 1 year following termination, if not sooner exhausted. At the expiration of the 1 year period, the parties shall endeavor to negotiate a program for the orderly disposition of any remaining assets of the Fund for Employee benefits not inconsistent with the purposes of the Plan.

*Id.* Article VII Section 2(b) of the SUB Plan set the JOBS/SUB Combined Maximum Liability Cap at $42.9 million. Section 3(d) set the SUB Maximum Liability Cap (SUB Cap) at $23.6 million. *Id.* at 270-71.

The central issue regarding liability under the SUB Plan is the meaning of the phrase "assets then remaining in the Fund." The Union argues that "the assets then remaining in the Fund" to be paid upon termination refers to the portion of the SUB Cap yet unpaid in SUB benefits. That amount is more than $20 million, say plaintiffs. The Company argues that the phrase refers to nothing, because there was no trust fund established. The Company also contends that the SUB Cap names only the highest amount the Company could expect to pay under the SUB Plan, and not the amount required to be paid under the Plan.

A "search for patent ambiguity must canvass the entire agreement." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 545 (7th Cir. 2000).  A survey of the entire SUB Plan agreement reveals significant and patent ambiguity in the relevant provisions.

The agreement defines the term "Fund" as being a trust fund created to receive "Company contributions" and pay out "Benefits and Separation Payments." Jt. Ex. 3 at 281.  The agreement further states that the Company was to "make weekly contributions to the trust Fund" in amounts sufficient to pay benefits "due and payable." Jt. Ex. 3 at 270.  The Company never created such a trust fund but instead paid benefits from its general assets.  Bischoff Dep. at 47-49; English Dep. at 41-42.  The provisions suggest that the term "assets then remaining in the Fund" refers only to the amounts in the specifically defined trust Fund that were placed there upon being "due and payable."

Under that reading, however, the provision in Section 4(b) appears to have no meaning.  Article VIII Section 4(b) provides for payment from the Fund for up to a year beyond SUB Plan termination.  Such a provision suggests that the parties expected that the "Fund" would contain substantial assets to fund benefits in excess of those already due and payable.  Article VIII Section 4(b) thus conflicts with the interpretation that the phrase "assets then remaining in the Fund" refers only to amounts in the trust Fund.

-13-

The ambiguity of the key provision is further exacerbated by Article VII Section 3(d):

> The parties will monitor the Fund on a regular basis and if it appears that the Combined JOBS/SUB Maximum Financial Liability Cap, as related to the SUB Plan, will be reached before the end of the Agreement, the parties, by mutual agreement, will have the prerogative to shift funds from JOBS to SUB or SUB to JOBS and/or to reduce the amount or duration of SUB to provide for an equitable means of distribution of the Company's remaining obligations.

Jt. Ex. 3 at 272.  This provision could reasonably lend itself to the interpretation that the "Fund" from which remaining assets must be paid constitutes the amounts named under the JOBS/SUB Maximum Financial Liability Cap.  The shifting of "funds" from JOBS to SUB and vice versa under this provision could also indicate that the maximum liability caps were treated by the parties as assets from which remaining amounts were to required be paid.  This interpretation is by no means unambiguously apparent, however, and the actual meaning of the relevant provisions is not demonstrated by the SUB Plan terms alone.

Further, conflicting testimony of Union and Company representatives regarding the objective course of the bargaining history fails to resolve the ambiguity created by the agreement, at least as a matter of law, leaving the meaning of the relevant provisions a genuine issue of triable fact.

Also unresolved is whether or not the funds paid by the Company toward the Voluntary Termination of Employment Program (VTEP) could be charged

against the JOBS/SUB Maximum Liability Cap.  The Company asserts that even if the Union is correct that remaining assets to be paid to the employees consisted of the unpaid amount under the SUB Maximum Liability Cap, the parties agreed that VTEP payments could exhaust, and did exhaust, that amount.

The parties agree that Appendix K of the agreement, a Memorandum of Understanding of the JOBS Program, combined with its Attachment A, a Memorandum of Understanding of the VTEP program, provided that VTEP payments could not be applied to the JOBS/SUB Maximum Liability Cap.  See Jt. Ex. 7 at 202, 209.  The Company asserts that this program was renegotiated by the parties and that the newly negotiated VTEP program became part of the JOBS Program, which would render VTEP amounts spent chargeable against the JOBS/SUB Maximum Liability Cap.  Def. Reply Br. at 26.  However, the evidence presented to the court does not show as a matter of law that there was a valid modification.[2]

The Company contends that documents from 2001 altered the parties' agreement by allowing the Company to charge VTEP payments against the JOBS/SUB Maximum Liability Cap.  Def. Br. at 30.  The first document, a letter from Kelly Bischoff, Corporate Director of Human Resources and Labor Relations for the Company, to Doug Oakley, Chairman of Local Union 662, signed by both,

---

[2]Some of the evidence cited by the Company to support its position, specifically pages 37-40 of the Deposition of John Messer, and pages 98-99 of the Deposition of Terry Thurman, were not submitted to the court.

stated the parties' recognition that as a result of VTEP payments, the JOBS/SUB Maximum financial liability cap had been exceeded.  Jt. Ex. 11.  Mike Conn, Director of Labor Relations, also issued a similar letter in July 2001, which was not signed by a Union representative.  Jt. Ex. 12.  Bischoff again issued such a letter in August 2001 that, like Conn's letter, was not signed by a Union representative.  Jt. Ex. 13.  A Memorandum of Understanding (MOU) reached by the parties on December 22, 2001 stated that VTEP payments would be offered to eligible employees and that the Company agreed to provide SUB benefits to any remaining employees "laid-off during the term of the collective bargaining agreement."   Jt. Ex. 5.   The Company's laches and statute of limitations arguments are also based on these documents.

The Union has come forward with evidence tending to show that the January, July, and August 2001 documents were based on misrepresentations by the Company.  Bischoff reported that Roderick English, Senior Vice President of Human Resources and Communications for the Company, claimed to have a letter reflecting an agreement with the international union that VTEP payments could be charged against the SUB Cap.  Local union officials repeatedly pressed to see a copy of the letter, and the Company insisted that it had such a letter. Eventually, however, English admitted that the letter did not actually exist. Bischoff Dep. at 35-36.  Bischoff also reported that the letter signed by Oakley was based on information provided to Bischoff from English.  *Id.* at 39-41.  Conn

testified that the end game of the negotiations was based on "false pretenses." Conn Dep. at 56, 59-61.

It is also unclear whether Oakley was authorized to bind the Union to the purported modifications. The Union claims that Oakley lacked such authority because the agreement itself was between only the Company and the International Union, not Local Union 662. Jt. Ex. 3 at 234. The Union relies on testimony of John Messer, International Servicing Representative of the Union, who had responsibility for administering contracts. He testified that Oakley did not have the authority to sign the January 2001 letter. Messer Dep. at 52-55. Though the Company acknowledges that Messer and Terry Thurman, Director of the International Union's Region 3, informed the Company that they alone spoke for the Union on international matters, Def. Br. at 6, the Company supports the validity of the January 2001 letter by citing testimony by Messer and Thurman that suggests they knew of the negotiations between Oakley and Bischoff, and that Messer may have advised Oakley in such negotiations. Def. Br. at 31; Messer Dep. at 52-54; Thurman Dep. at 127-28. This murky situation, thickened by the admitted deception by the Company, is not the stuff of summary judgment.

Additionally, while the December 22, 2001 agreement between the parties does provide for VTEP payments and SUB benefits, the agreement does not unambiguously state that VTEP payments were to be charged against the JOBS/SUB Maximum Liability Cap. Jt. Ex. 7. The two-line statement regarding

SUB payments does not, as a matter of law, unambiguously alter the parties' lengthy and specific agreement regarding the payment of SUB benefits.  As a result, a reading of the agreement between the parties regarding the JOBS/SUB Maximum Liability Cap and the VTEP payments reveals ambiguity with respect to whether the latter could be charged to the former.

Extrinsic evidence presented regarding the payment of SUB Plan benefits again does not resolve as a matter of law the ambiguity created by the written agreement.  Thurman Dep. at 136; Messer Dep. at 124-26; Bischoff Dep. 51-54. Based on the ambiguity created by the language of the agreement and the extrinsic evidence presented, genuine issues of triable fact exist regarding the application of VTEP payments toward the JOBS/SUB Maximum Liability Cap and any modification of the Company's obligation to pay SUB benefits.

*Conclusion*

For the reasons stated, the court denies defendants' motion for summary judgment (Docket No. 53) and plaintiffs' motion for summary judgment on the issue of liability (Docket No. 63).  The case remains set for a jury trial on October 11, 2005.

So ordered.

Date: September 9, 2005

_David F Hamilton_

-18-

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Margaret Casey Bettendorf
LITTLER MENDELSON, P.C.
mbettendorf@littler.com

Robert C. Long
LITTLER MENDELSON
rlong@littler.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Daniel Srsic
LITTLER MENDELSON
dsrsic@littler.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP
dswider@boselaw.com